IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JON CLARK,

                          Plaintiff,                        OPINION AND ORDER

        v.
                                                           14-cv-412-wmc
CUNA MUTUAL LONG TERM DISABILITY
PLAN and CUNA MUTUAL INSURANCE
SOCIETY,

                          Defendants.

In this ERISA action, plaintiff Jon Clark challenges the decision of defendant CUNA Mutual Insurance Society, his former employer, and its benefit plan, defendant CUNA Mutual Term Disability Plan, denying him long term disability insurance. Before the court are cross motions for summary judgment. (Dkt. ##14, 17.) For the reasons that follow, the court concludes that defendants acted arbitrarily and capriciously in denying Clark benefits. Accordingly, the court will grant plaintiff's motion, deny defendants' motion, and will remand for further administrative proceedings consistent with this opinion.[1]

---

[1] Plaintiff requests that the court take judicial notice of Clark's recent approval for SSDI benefits. (Pl.'s Request (dkt. #35).) Defendants properly object to this request on the basis that "[d]eferential review of an administrative decision means review of the administrative record." (Defs.' Obj. (dkt. #36) (quoting *Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan*, 195 F.3d 975, 982 (7th Cir. 1999)).) As such, the court declines plaintiff's request and has not considered any decision awarding Clark SSDI that is not part of the administrative record here. As indicated below, however, defendants may consider that decision on remand.

UNDISPUTED FACTS

**A. The Parties**

Plaintiff Jon Clark is a participant in defendant CUNA Mutual Long Term Disability Plan ("the Plan"). The Plan is an employee welfare benefit plan subject to the Employee Retirement Income Security Act of 1974 ("ERISA"). Defendant CUNA Mutual Insurance Society ("CUNA Mutual"), now known as CMFG Life Insurance Company, is Clark's former employee. At times, the court will refer to the defendants collectively as "CUNA."

As an employee, CUNA Mutual issued Clark coverage under the Plan. During the course of Clark's employment, he became eligible for certain employee benefits, including long-term disability insurance ("LTDI") as provided by the Plan. Disability Management Services, Inc. ("DRMS") is the claims administrator of the Plan, with the delegated authority to issue benefits on behalf of defendants. (R. at CM-CLARK_000033-34.)

**B. Relevant Plan Terms**

The Plan provides for payment of LTDI benefits after the "Elimination Period" when CUNA "receive[s] proof that

> 1. You are Totally Disabled or Partially Disabled due to Sickness, Injury, Mental/Nervous Disorder, or Substance Abuse; and
>
> 2. You require the regular care and attendance of a Physician for Treatment in connection with the Totally Disabling or Partially Disabling condition. The Treatment must be provided by a Physician certified to treat Your specific condition and must be aimed at maximizing recover and return to work, when possible; and

2

3. You are in compliance with the Treatment plan outlined by Your Physician; and

4. Your Total Disability or Partial Disability started while You were insured under the Policy and results in a loss of income from employment for You.

(R. at CM-CLARK_000014.)

The Plan defined "Total Disability" or "Totally Disabled" as:

**Total Disability or Totally Disabled** means during the Elimination Period and the next 36 months of disability You are unable to perform, with reasonable accommodation, all of the Material and Substantial Duties of Your Own Occupation because of any Injury, Sickness, Mental/Nervous Disorder, or Substance Abuse.

After 36 months of benefits have been paid, it means because of an Injury, Sickness, Mental/Nervous Disorder, or Substances Abuse You are unable to consistently perform, with reasonable accommodation, all the Material and Substantial Duties of any gainful occupation for which You are or could reasonably become qualified by training, education, or experience.

(R. at CM-CLARK_000008.)

"Injury" is defined as "bodily injury resulting directly from an accident and independently of all other causes," and "Sickness" is defined as "an illness, disease, pregnancy or Complications of Pregnancy," not including "Mental/Nervous Disorder or Substances Abuse."  (R. at CM-CLARK_000006-7.)

"Own Occupation" is defined as "the occupation You were performing on the beginning date of Total Disability or Partial Disability[.]   We will look at Your occupation as it is normally performed instead of how the works tasks are performed for

a specified employer or at a specific location and will not consider any tasks performed in excess of 40 hours per week."  (R. at CM-CLARK_000006.)

"Material and Substantial Duties" are those "normally required for the performance of Your Own Occupation or any occupation, and cannot be reasonably omitted or modified except that We will consider You able to perform the Material and Substantial Duties if You are working or have the capacity to work 40 hours per week." (R. at CM-CLARK_000006.)

"Elimination Period" is defined as "a period of consecutive days of Total Disability or Partial Disability for which You are under the regular care and attendance of a Physician and for which no benefit is payable."  (R. at CM-CLARK_000005.)  For Clark, the schedule of benefits provides that the elimination period is 120 days, and it is undisputed that this period was satisfied as of November 10, 2011.  (R. at CM-CLARK 000003, 270.)


**C.  Clark's Employment History**

Clark worked as a "Retirement Education Specialist, Virtual," at CUNA from July 26, 1990, to July 13, 2011.  In that position, Clark's duties included presenting, educating and promoting retirement plans through virtual educational sessions, providing technical/product training to credit unions and their employees, and assisting in the sales and marketing of available retirement options.  The position required Clark to be able to sit, stand, write, operate a keyboard and other office equipment, reach, walk, and lift/carry/push/pull up to ten pounds.  It also required about ten percent travel time.

4

Clark's last day at work was July 12, 2011.  The next day, Clark received a third discectomy of his right L5-SI disc space, which is described below.

### D. Medical Conditions

#### i.  Overview

At various times, Clark has been diagnosed with the following medical conditions: lumbar radiculopathy, herniated nucleus pulposus (lumbar), degenerative disc disease, disc collapse, foraminal stenosis, chronic lower back pain, right-sided lower extremity pain, recurrent disc herniation at L5-S1, depression, and residual right nerve root tension and weakness in the right lower extremity.  At various times, Clark's medical records reveal that he suffers from chronic pain in his lower back, pain in the right buttock and posterior aspect of the thigh to the knee and proximal calf, numbness and tingling in his right leg, limited range of motion, radiculopathy, and radiation down the back of the right leg with sharp shooting pain.[2]

Clark regularly takes ibuprofen (1,000 mg. daily) and aspirin (975 mg. daily) to take the edge off of his pain.  He previously used certain prescription medications, including gabapentin and hydrocodone, but experienced negative side effects and was concerned about developing an addiction to painkillers.  CUNA does not dispute this, but disputes any inference that this means Clark has exhausted his available options for pain management.

---

[2] CUNA disputes whether the record fully substantiates these pain reports.

5

ii.     Timeline of Significant Medical Events

**2006-2010**

In the summer of 2006, Clark injured his back while lifting a heavy couch, causing it to seize up and pain to radiate down his buttocks, right hamstring and calf.  X-rays and MRI in June and July 2007 revealed a large disc protrusion at L5-S1.  Clark attempted several, non-invasive treatments, some of which provided some improvement in pain, but he ultimately opted for surgery.   On July 18, 2007, Clark underwent an L5-S1 microdiscectomy performed by an orthopedic surgeon, Thomas Zdeblick, MD.

In September 2007, Clark reinjured his back when, as a spectator at a triathlon, he attempted to save a swimmer from drowning.  A January 2008 MRI later revealed a recurrent right paracentral disc protrusion at L5-S1 with surrounding granulation tissue causing posterior lateral displacement of the right S1 nerve root.  Dr. Zdeblick diagnosed Clark with a recurrent disc herniation at L5-S1, as well as recurrent, right-sided sciatica, and performed a revision microdiscectomy at L5-S1 on February 18, 2008.

Following the second surgery, Clark's condition improved enough for him to return to work, although he continued to have low back pain.  Clark contends that his improvement stalled, however, after a coughing incident in May 2008, when he felt a "pop" in his back and pain in his right calf.  At a May 2008 appointment, Dr. Zdeblick noted that Clark's Oswestry Score was 58%.[3]  At that time, Clark also reported continued back and leg pain.

---

[3] "The Oswestry Disability Index (ODI) is an index derived from the Oswestry Low Back Pain Questionnaire used by clinicians and researchers to quantify disability for low back pain." "Oswestry Disability Index," Wikipedia, https://en.wikipedia.org/wiki/Oswestry_Disability_Index

<u>2011</u>

In December 2010 and January 2011, Clark underwent right L5 transforaminal epidural steroid injections.  Clark contends, however, that his lower back pain intensified, particularly when sitting.  On March 28, 2011, Dr. William Bodemer restricted Clark from working due to his pain.

Two days later, Clark began a seven-visit course of physical therapy.  While the physical therapy reduced Clark's pain, the physical therapist noted at this last visit that certain functional limitations remained.

A May 10, 2011, x-ray of the lumbar spine revealed increasing disc height loss at L4-5, especially at L5-S1.  Based on this x-ray, Dr. Lindsey Heiser found lower lumbar degenerative disc and facet disease with disc changes, noticeably worsening at L5-S1.  Clark nevertheless returned to work on May 16, 2011, but was restricted to part-time status.

On May 31, 2011, Clark underwent a disc stimulation at L3-4 and L4-5, and on July 13, 2011, Clark underwent another revision microdiscectomy at L5-S1, again performed by Dr. Zdeblick.  At an August 11, 2011, follow up appointment, Clark reported that his pain levels had decreased, but that he still experienced lingering pain in his lower back and radiating down his right leg.  At that appointment, Clark further indicated that his pain inhibited him from sitting longer than twenty minutes and he had

_____

(last visited July 23, 2015) (describing the range of 41-60 as "severe disability").  CUNA points out that a medical student recorded Clark's Oswestry score as 58%.  (Defs.' Resp. to Pl.'s PFOFs (dkt. #27) ¶ 49.))

not returned to work.  Clark reported taking over-the-counter pain medications.  At that appointment, Dr. Zdeblick rated Clark's Oswestry Score was 78%.[4]

In September 2011, Clark saw Dr. Yeomans, a chiropractor, for a disability review.  Dr. Yeomans' subsequent, six-page report appears to contain conflicting viewpoints.  As plaintiff points out, Dr. Yeomans acknowledges Clark's "[s]ignificant pain behavior," opines that "Clark has sustained permanent impairment," and concludes that "it is clear that his current work capacity is very limited, especially when considering his poor tolerance to prolonged sitting."  (R. at CM-CLARK_000655-58.)  As defendants point out, however, Dr. Yeomans' report also states in the "Work Restriction" section that "the patient is able to perform the duties required by his current occupation.  Therefore, no specific work restrictions were issued as result of today's examination."  (R. at CM-CLARK_000657.)[5]

## 2012

Beginning in December 2011, Clark began another course of physical therapy.  Initially, he reported pain levels of 8 out of 10 to the physical therapist.  Over time, the physical therapist noted slow progress, but that his overall status remained unchanged.  Still, by February 2012, Clark reported to the physical therapist and Dr. Perry that the therapy was helping his low back pain.

---

[4] According to Wikipedia, this falls within the "crippling back pain" category.  CUNA again points out that a medical student recorded the score.

[5] As described below, Dr. Yeomans later clarified his initial assessment in response to questions of consulting physicians reviewing Clark's disability claim on behalf of defendant.

In July 2012, Clark returned to the UW Clinic to be evaluated by Dr. James W. Leonard, D.O., who noted that Clark was "still having pain in his low back with radiation into his right leg." (R. at CM-CLARK_000418.) Dr. Leonard suspected reherniation at the L5-S1 disc level and ordered an MRI.[6] Dr. Leonard later noted that this MRI revealed a new disc herniation at the right L5-S1. He then referred Clark to Dr. Zdeblick to determine if Clark was a candidate for a fusion at L5-S1.

In August 2012, Clark returned to Dr. Zdeblick. According to his notes, Clark reported being unable to sit for more than twenty minutes without miserable pain and tingling in his right leg. At that time, Dr. Zdeblick discussed an L5-S1 fusion with Clark, but Clark wanted to think about it before proceeding with additional surgeries.

On September 13, 2012, Dr. Yeomans concluded as a chiropractor that Clark could not sustain sedentary work based on: a September 7, 2012, discussion with Clark about his current level of pain; Clark's updated outcomes assessment tools; and his review of Dr. Zdeblick's August 3, 2012, report.

## 2013

Almost one year later, in July 2013, Clark returned to Dr. Leonard to inquire whether any new technologies or treatment options were available. Dr. Leonard's notes at that time describe the same back pain radiating down Clark's right leg. Dr. Leonard also noted that Clark appeared uncomfortable in his chair, preferred to stand, had an antalgic gait, and had extremely limited lumbar flexion. Dr. Leonard's assessment was that Clark had "chronic low back pain with a history of 3 micro diskectomies at the right

---

[6] CUNA points out that Dr. Zdeblick had previously ordered an MRI on September 16, 2011.

L5-S1 level.  Previous MRI done on July 24, 2012, shows re-herniation of the right L5-S1

disk."   (R. at CM-CLARK_000117.)   Based on this, Dr. Leonard "anticipate[d]

continued disability due to his low back pain disk herniation."  (*Id.*)  This conclusion was

reiterated in a September 17, 2013, letter from Dr. Leonard:

> Given the severity of your lumbar and leg pain, I do not
> believe you are employable, due to your pain with your
> activity, including your inability to tolerate sitting for even
> short durations.  You are functioning at less than sedentary
> level, and I do not believe you would be able to tolerate even
> part-time employment in any occupation.  I anticipate this
> will be a permanent condition.

(R. at CM-CLARK_000115.)


### E.  Clark's Self-Reported Restrictions

Clark reported that his activities of daily living are limited due to pain in his right

lower back and leg.  On a typical day, Clark wakes up between 4:00 and 5:00 a.m.

because of his pain.  He may shop for groceries, perform household chores, or cook, but

must rest in between activities, often on his stomach to relieve the nerve pain that

radiates down his leg.

Clark also reported being unable to perform daily living activities consistently

without assistance.  He can sit for approximately 15 to 30 minutes at a time before he

has to change position and is unable to drive for more than 15 to 30 minutes, though as

defendant points out he drove himself to a chiropractor appointment that took him

about 3 hours.   (Defs.' Resp. to Pl.'s PFOFs (dkt. #27) ¶ 107.)[7]   Clark goes to bed around 7:00 p.m. due to pain and exhaustion, but wakes up several times per night.   If he engages in additional physical activity, he suffers additional pain and fatigue.   While the administrative record contains Clark's reports about his level of pain, defendants also point to "several notations showing that Clark's condition had in fact improved."   (*See, e.g.*, Defs.' Resp. to Pl.'s PFOFs (dkt. #27) ¶ 100.)

### F.  Denial of LTDI Benefits and Physicians' Assessments

#### i.    Initial Denial

Clark applied for and received full, short-term disability benefits with CUNA. Clark applied for long-term disability benefits under the Plan's LTDI to commence on November 10, 2011.   On December 2, 2011, a representative of DRMS wrote to Clark as the claims administrator "a[s] we discussed on 11/22/11[,] [the Plan] do[es] not have medical information to support [ongoing] disability post 4 weeks from your date of surgery.   Therefore, please provide the information requested above so we can further assess benefits payable."   (R. at CM-CLARK_000594.)

On December 19, 2011, Clark responded through counsel that he received medical care from "Duane at Lodi Medical Clinic," and that he was scheduled to begin physical therapy with Rusty Wauer the next day.   In follow-up communications, however, DRMS confirmed its understanding that Lodi Medical Clinic had not treated

---

[7] Clark reported having to stop every 30 minutes while driving to stretch.   (Pl.'s Reply to Pl.'s PFOFs (dkt. #31) ¶ 107.)

Clark since March 31, 2011.  As a result, DRMS requested Clark's assistance in obtaining outstanding information.

By letter dated March 28, 2012, DRMS notified Clark that his claim for LTDI benefit was denied "[b]ased on the sedentary occupational demand level and Mr. Clark's sedentary work capacity."  (R. at CM-CLARK_000486.)  Given this residual capacity, DRMS concluded that Clark did not meet the definition of Total Disability on September 20, 2011, which preceded the end of the Elimination Period.  (*Id*.)  In this March 28 denial letter, DRMS also faulted Clark for not meeting "his duty of reasonable cooperation on his claim," resulting in DRMS being "unable to conduct a complete a[nd] thorough investigation and evaluation of his claim beyond 9/20/2011, or make a claim decision based on the complete and relevant facts."  (R. at CM-CLARK_000487.)  Since Clark "failed to satisfy an important precondition to his claim" and "to provide sufficient proof of claim as required by the Policy," DRMS concluded that it had "no alternative but to deny his claim for these reasons."  (*Id*.)

In denying benefits, DRMS relied at least in part on the opinion of a physician consultant, Dr. Lawrence Broda.  Dr. Broda reviewed office notes, correspondence and studies, including those of Drs. Zdeblick, Yeomans, Bryce, Leonard, providers at Orthopedic Associations of Sauk Prairie, and physical therapy, although he did not examine Clark personally.  In his report, Dr. Broda particularly criticized Dr. Yeomans' September 20, 2011, evaluation as "an invalid measurement of functional capacity" because it did not include object handling, evaluations of many types of positioning or balance measures, or validity testing.  (R. at CM-CLARK_000519.)  Dr. Broda also found

12

"inconsistencies regarding activity levels" because of Clark's ability to stand for one hour during the examination and drive for three hours to the appointment, despite indicating that he could not sit or stand for longer than 25 minutes.   Clark points out that Dr. Yeomans noted in his September 20, 2011, report that Clark self-reported having to stop every thirty minutes during the drive, to get out of the car to move around and stretch. (R. at CM-CLARK_000654.)

Dr. Broda limited Clark to lifting/carrying of ten pounds; no bending, crawling, stooping or crouching; ability to change from seated to standing position for 5-10 minutes every hour, or alternatively a sit/stand workstation.   In addition, Dr. Broda spoke with Dr. Yeomans directly and then he summarized their discussion in a March 9, 2012, letter.   In response to that letter, Dr. Yeomans confirmed his belief that Clark was limited to

> Sedentary Physical Demand Characteristic work level with the need to change positions frequently between sitting and standing in which he should self-manage or regulate as tolerance between sitting and standing will most likely be variable.   A 4 hour work schedule is recommended initially (20 hrs. max/week) to determine tolerance with a gradual increase in work hours if tolerance is noted.

(R. at CM-CLARK_000500.)   Dr. Yeomans similarly clarified that the functional capacity exam was not based on self-reporting, but rather on 23 functional tests.   With respect to whether Clark could work full-time, Dr. Yeomans stated "[a] sit/stand option at sedentary work may be tolerated but possibly not full time."   (R. at CM-

CLARK_000502.)[8]   DRMS also relied on the vocational consultant Nancy Gilpatrick's review of Clark's job description and her determination that the job was sedentary.

### ii.   Appeals

#### (a) First

On September 21, 2012, Clark appealed DRMS's initial denial of benefits.   On February 26, 2013, DRMS reversed in part its prior decision, concluding that Clark *was* disabled for a six month period from July 13, 2011, to January 13, 2012.   Clark received LTDI benefits from November 10, 2011, through January 13, 2012.   (He had already received benefits for the earlier, three month period.)   DRMS based this decision in part on the medical record review of yet another consulting physician, Dr. James Boscardin, and another vocational assessment by consultant Teresa Marques.   Dr. Boscardin reviewed at least portions of Clark's medical record, but like Dr. Broda, did not personally examine Clark.   As had Broda, Dr. Boscardin also discounted Dr. Yeomans' study because it was based mainly on self-reported issues and was not performed by someone who had spent time with Clark to observe his mannerisms and compliance.

At the same time, Dr. Boscardin acknowledged that "[i]n general, anyone who has had 3 operations and is not doing well has a very poor prognostic outlook."  (R. at CM-CLARK_000289.)   Dr. Boscardin also considered possible fusion surgery, characterizing it as a

> last resort with no great indications that it is going to be
> successful.   Statistics would suggest that even with this
> procedure, he would not be able to return to his normal

---

[8] Plaintiff takes issue with DRMS and Dr. Broda's consideration -- or lack thereof -- of Dr. Yeomans' March 2012 letters.

> occupation/function or even a sedentary level of occupation/function.

(*Id.*)   Retrospectively, Dr. Boscardin also concluded that Clark would have been precluded from performing even sedentary activities for the six month period following his surgery (July 13, 2011, to January 13, 2012).

Even so, Dr. Boscardin concluded that Clark would have been able to perform sedentary work after January 13, 2012, relying on the "long gap" between his visits with Dr. Zdeblick from September 2011 until August 2012. In Dr. Boscardin's view, this sedentary work would be subject to the following permanent restrictions: (1) sedentary level activity/functioning with lifting to 10 pounds; (2) sitting for an hour at a time, then walking and standing for an hour each; and (3) the standing and walking periods could account for four hours each in an eight-hour period. In response to a request for clarification, Dr. Boscardin added without explanation on February 10, 2013, that Clark could sit and stand for thirty minutes at a time during an eight-hour day with total sitting time of no more than six hours in an eight hour day. Dr. Boscardin further noted that Clark should be able to change his position every thirty minutes. In denying Clark's appeal, DRMS also relied on vocational expert Teresa Marques' opinion that Clark's job duties were consistent with the physical capability described by Dr. Boscardin.[9]

### (b) Second

On August 22, 2013, Clark again appealed DRMS's denial of benefits beyond January 13, 2012. On October 29, 2013, DRMS affirmed its decision "based on a lack

---

[9] While plaintiff is critical of this opinion, he does not include it as a basis for finding CUNA acted arbitrarily or capriciously in denying him LTDI past January 13, 2012.

of medical evidence to support disability." (R. at CM-CLARK_000051-52.) In support, DRMS relied on an independent record review of Dr. Stewart Russell. Like Drs. Broda and Boscardin, Dr. Russell did not physically examine Clark. DRMS's letter denying this second appeal did not reference any new or updated vocational assessments.

Following his review, Dr. Russell also concluded that Clark would be able to return to full-time sedentary work (with certain restrictions) six months after his surgery date. In support of this conclusion, Dr. Russell relied on the fact that (1) Clark did not have an MRI as suggested by his physician, (2) "did not return for additional medical or surgical evaluation for about a year," (3) "was not taking an pain medication," and (4) did not engage in "further PT [except swim therapy], acupuncture, [or] epidural steroid injections." (R. at CM-CLARK_000200.)

In response, plaintiff faults Dr. Russell for failing to take into account certain medical appointments, including his appointment with Dr. Leonard in July 2012, in which he reported continued pain. Plaintiff also faults Dr. Russell for failing to call his treating physician Dr. Leonard, and takes issue with Dr. Russell's conclusion that the restrictions and limitations noted by Dr. Leonard are not applicable to the time frame at issue. Curiously, in its denial letter, DRMS explained that Clark could request yet another view of his claim and submit additional information and comments.

### (c) Third

On March 14, 2014, Clark submitted yet another appeal, including additional documentation. In particular, Clark submitted statements from his wife, son, mother and a close friend, along with his own supplemental statement. Clark also submitted a

16

February 11, 2014, Musculoskeletal Impairment Residual Functional Capacity Questionnaire completed by Dr. Leonard.  The form referred to Clark's July 2012 office visits and Dr. Leonard's earlier September 2013 letter, which noted that Clark's pain frequently interferes with his attention and concentration, that he would require periods of walking and lying down and that he would be absent from employment more than three times per month due to pain and limitations.  In his February 2014 questionnaire, Dr. Leonard also noted that Clark's impairments can be expected to last at least twelve months, and that it would markedly limit his ability to deal with the normal stresses of competitive employment.   Clark also resubmitted:   Dr. Zdeblick's September 2011 treatment notes, results of the July 24, 2012, MRI; and Dr. Yeomans' September 2012 letter.  Finally, in his own statement, Clark asserted that his condition had not improved.

By letter dated May 14, 2014, DRMS again upheld its determination to terminate Clark's LTDI benefits on January 13, 2012.  In support of this decision, DRMS primarily relied on Dr. Russell's second review of Clark's medical file.   In reconciling Clark's treatment notes from 2012, Dr. Russell explained:

> While an inability to work could be supported as of 9/17/2013, when Dr. Leonard opined that he has less than sedentary work capacity, this does not translate back to 1/13/2012, when he had full-time sedentary work capacity. Since the repeat MRI was not performed until 7/24/2012, it would be more likely that his condition deteriorated closer to that date.

(R. at CM-CLARK_000067.)  Dr. Russell concluded that "there is no evidence when the re-herniation of his disc occurred.  To state this was present as of 9/2011 without any confirmation in the form of imaging studies is pure conjecture."  (*Id.* at CM-

17

CLARK_000069.)  In so concluding, Dr. Russell characterized as "unreasonable" Clark's failure to "seek appropriate medical attention or attend testing ordered by the operating surgeon through a 10-month period of time (9/2011 to 7/2012) if [he] were in so much pain that [he] were unable to function." (*Id.*)

Clark criticizes this third denial in several respects, all of which are discussed below, but most notably, once again takes issue with DRMS's failure to consider the restrictions and limitations noted in Dr. Leonard's questionnaire.  Defendants contend that Dr. Leonard's responses to the latest questionnaire merely reflects his view of Clark's status *as of February 2014*, not on or after January 13, 2012, and, therefore, are not material.

OPINION

This court must review an administrator's decision to deny eligibility for ERISA insurance plan benefits under a generous "arbitrary and capricious" standard.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010).  While this standard of review is obviously highly deferential, the Seventh Circuit has cautioned that the court is not a "rubber stamp." *Holmstrom*, 615 F.3d at 766.[10]  "For ERISA purposes, the arbitrary and capricious

---

[10] The Seventh Circuit has stated in the past that the decision must be "downright unreasonable" before reversal by a federal court would be appropriate, but clarified that observation in *Holmstrom*, explaining that the standard of review:

> should not be understood as requiring a plaintiff to show that only a person who had lost complete touch with reality would have denied benefits.  Rather, the phrase is merely a shorthand expression for a vast body of law applying the arbitrary-and-

standard is synonymous with abuse of discretion." *Id.* at 767 n.7 (internal citation, quotation marks and alterations omitted).

More specifically, ERISA requires that "the administrator . . . weigh the evidence for and against [the denial of benefits], and within reasonable limits, the reasons for rejecting evidence must be articulated if there is to be meaningful appellate review." *Halpin v. W.W. Grainger*, 962 F.2d 685, 695 (7th Cir. 1992) (internal citation and quotation marks omitted). The court will, therefore, uphold an administrator's decision "if (1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass important aspects of the problem." *Militello v. Cent. States, Se. & Sw. Areas Pension Fund*, 360 F.3d 681, 686 (7th Cir. 2004) (internal quotation marks and citations omitted).

Regardless of the precise formulation, the court is satisfied that defendants' failure to explain their rejection of Drs. Yeomans' and Leonard's more informed, contrary opinions in favor of the largely unsubstantiated opinions of their retained consultants prevents a meaningful review of their decision to deny benefits. Accordingly, a remand is necessary for further proceedings.

---

capricious standard in ways that include focus on procedural regularity, substantive merit, and faithful execution of fiduciary goals.

615 F.3d at 766 n.5.

## I.  Plaintiff's Challenges

Plaintiff asserts that defendants abused their discretion in three key respects: (1) by reviewing medical evidence selectively to their own advantage, including using one medical consultant for two reviews; (2) by relying on medical consultants who failed to provide reasoned explanations; and (3) by creating a moving target, requiring plaintiff to submit evidence that post-dated the termination decision and then rejecting that evidence for failing to reflect his condition on the date of termination.[11]  The court will review each challenge in turn.

### A.  Selectively Reviewing Medical Evidence

Plaintiff's primary argument for finding his denial of LTDI benefits was arbitrary and capricious revolves around criticism of defendants' medical consultants' review of Clark's medical record.  *First*, plaintiff argues that defendants disregarded *his* medical evidence, in particular Dr. Yeomans' September 2011, six-page report detailing his work capacity, as well as Yeomans' March and September 2012 supplements.  In response,

---

[11] In addition to raising substantive challenges to defendants' termination decision, plaintiff also posits one procedural challenge:  that defendants violated ERISA by having Dr. Russell review both the second and third appeal.  ERISA § 503 requires plan administrators to follow claims procedures that give beneficiaries "a reasonable opportunity . . . for a full and fair review by the appropriate named fiduciary."  29 U.S.C.A. § 1133.  The Department of Labor promulgates regulations specifying the minimum procedures that plans should use to provide a "reasonable" review.  29 C.F.R. § 2560.503-1; 29 U.S.C.A. § 1135.  For instance, the regulations require plans to maintain procedures for reviewing adverse determinations.  29 C.F.R. § 2560.503-1(h).  Significant procedural errors that deprive a claimant of a full and fair review may justify reinstatement of the benefits or an order for remand, even under an arbitrary and capricious standard.  *Halpin*, 962 F.2d at 698; *Wolfe v. J.C. Penney Co.*, 710 F.2d 388, 393 (7th Cir. 1983).  However, "substantial compliance" with the regulations is sufficient; not every technical error will undermine the administrator's decisions.  *Brown v. Ret. Comm. of the Briggs & Stratton Ret. Plan*, 797 F.2d 521, 535-36 (7th Cir. 1986); *Halpin*, 962 F.2d at 690.  As a procedural matter, the defendants' reliance here on Dr. Russell's review for both plaintiff's second and third appeals falls into the category of "substantial compliance," although it is a factor the court will consider as a substantive concern in the opinion that follows.

defendants point out that Dr. Yeomans was not a treating physician. While this argument may permit defendants to *discount* Dr. Yeomans' opinion, they still "must address any reliable, contrary evidence presented by the claimant." *Love v. Nat'l City Corp. Welfare Benefits Plan*, 574 F.3d 392, 397 (7th Cir. 2009); *see also Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."). Notably, Dr. Yeomans conducted a physical examination of Clark, something none of the three physicians retained by defendants did. Defendants' apparent decision to disregard Dr. Yeomans' more thorough review at least deserved some explanation. Otherwise, this court cannot meaningfully review defendants' decision to reject it.

Defendants nevertheless justify the decision by their medical consultants to disregard Dr. Yeomans' opinion because of the subjective nature of his assessment. Defendants fail, however, to even acknowledge, much less address, Dr. Yeomans' supplemental reports, which explain that his examination was actually based on his own, physical examination, rather than just Clark's self-reporting as suggested in defendants' letters denying his appeals. Moreover, even if Dr. Yeomans' conclusions *were* based on Clark's subjective reports of pain, defendants still must address the reasonableness of Dr. Yeomans' restrictions and limitations. *See Leger v. Tribune Co. Long Term Disability Benefits Plan*, 557 F.3d 823, 834-35 (7th Cir. 2009) (remanding in part because of the Plan's failure to consider the results of a functional capacity evaluation on the basis that the test was based on subjective complaints of pain).

Plaintiff also faults defendants' failure to address Dr. Leonard's September 2013 questionnaire, contending that "[n]either defendants nor their medical reviewers acknowledged this Questionnaire or the information therein." (Pl.'s Opening Br. (dkt. #18) 15 (emphasis omitted).)   Not entirely so.   Defendants acknowledged the Questionnaire, but placed no weight on it solely because it post-dated the relevant period.  Again, the fact that it post-dates the termination deadline does not mean it is not subject to consideration.  As the Seventh Circuit explained in *Holmstrom*, 615 F.3d at 776, a Plan Administrator cannot request additional medical evidence and then simply reject that evidence on the basis that it post-dates the relevant termination or denial decision.  As that court explained, defendants' position would mean that an insurer's "termination of benefits for lack of supporting evidence could never by successfully appealed if the claimant had not already undergone . . . testing" before an initial denial. *Id.*  This is especially untenable in cases involving chronic conditions, like that at issue here.  Particularly given Dr. Leonard's long-standing treating relationship with Clark -- and the fact that the record reflects significant back issues, including three surgeries, over a several year period of time -- defendants should, therefore, have addressed Dr. Leonard's September 17, 2013, letter beyond merely dismissing it for postdating their initial denial decision.

*Second*, and relatedly, plaintiff faults defendants for relying solely on their paid medical consultants, rather than arranging for an independent examination.  The court certainly credits plaintiff's argument that the independent medical examiners on which defendants purport to have relied in denying Clark benefits, and when repeatedly

affirming that decision, are not truly "independent," but ERISA does not require plan administrators to arrange for an independent medical examination before denying or terminating benefits. *See Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 577 (7th Cir. 2006) ("It is reasonable, therefore, for an administrator to rely on its doctors' assessments of the file and to save the plan the financial burden of conducting repetitive tests and examinations."). Accordingly, there appears no legal basis to find that defendants acted arbitrarily and capriciously in failing to secure a truly independent evaluation here.

*Third*, plaintiff contends that defendants violated ERISA and their own internal policies by having Dr. Russell review both plaintiff's second and third appeals. In asserting this argument, plaintiff relies on 29 C.F.R. § 2560.503-1(h)(3)(v), which provides in pertinent part:

> Group health plans. The claims procedures of a group health plan will not be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination unless, in addition to complying with the requirements of paragraphs (h)(2)(ii) through (iv) of this section, the claims procedures—
>
> . . .
>
> (v) Provide that the health care professional engaged for purposes of a consultation under paragraph (h)(3)(iii) of this section shall be an individual who is neither an individual who was consulted in connection with the adverse benefit determination that is the subject of the appeal, nor the subordinate of any such individual[.][12]

---

[12] Plaintiff also points to the Plan's "Voluntary Appeal Review Procedures," but that provision governs the individual *making* the adverse decision or reviewing an appeal (or appeals) of that decision, not the engagement of a consulting health care professional.

Here, defendants retained Dr. Russell to conduct the review of their decision to terminate Clark's benefits effective January 23, 2012, and then retained him for a second voluntary appeal of that decision. As such, defendant did not retain the same doctor for both the adverse benefit determination and for the appeal of that decision. Instead, Dr. Russell was asked to consult on two, sequential appeals. Plaintiff fails to explain how this arrangement violates the plain language of the pertinent regulation.

As previously discussed, with respect to the broader overarching challenge, however, the court agrees with plaintiff that defendants acted arbitrarily and capriciously by failing to offer a reasoned explanation for rejecting Dr. Yeomans' and Dr. Leonard's opinions that Clark was not capable of working.

### B. Failing to Provide Reasoned Explanations

Similarly, plaintiff contends that defendants acted arbitrarily and capriciously in accepting the opinions of medical consultants hired to review Clark's medical record despite the consultants' failure to provide reasoned explanations for finding that he was not disabled after January 23, 2012. For reasons explained below, the court again largely agrees with plaintiff. As previously explained, in finding Clark not disabled under the Plan, defendants were required to provide a "reasoned explanation," which reflects consideration of "the relevant factors that encompass the important aspects of the problem." *Militello*, 360 F.3d at 686. Normally, such an explanation would begin with a reasoned explanation by the medical experts upon which defendants purport to rely. Unfortunately, such an explanation is largely absent on this record.

24

With respect to Dr. Boscardin, plaintiff argues that he failed to provide a reasoned explanation for finding Clark "no longer disabled" six months after his third surgery date. The court agrees with plaintiff that Dr. Boscardin's letter is internally inconsistent, as is his conclusion that Clark would only be disabled for a seemingly arbitrary six-month period of time. *See Love v. Nat'l City Corp. Welfare Benefits Plan*, 574 F.3d 392, 297 (7th Cir. 2009) ("[B]are conclusions are not a rationale." (quoting *Halpin*, 962 F.2d at 693)).

Still, Dr. Boscardin's view is largely immaterial given that plaintiff's challenge primarily concerns defendants' decision to deny benefits past January 2012. In making this determination, defendants primarily relied on Dr. Russell's role in the second and third appeal. Dr. Russell purported to discount Clark's claims of disabling lower back pain based almost entirely on the belief that Clark would have sought more extensive treatment -- beyond physical therapy -- during the nine-month period of time from September 2011 to July 2012 if he actually suffered from the debilitating pain he claims.

In criticizing Clark for failing to seek treatment for his purported pain during this period, however, Dr. Russell fails to address Clark's extensive and largely failed efforts to treat his lower back pain in the past. In contrast, the record demonstrates starkly he myriad treatment methods for pain relief that Clark had pursued, including physical therapy, prescription pain medication, yoga, acupuncture, and pool therapy, not to mention at least two, failed surgical interventions. In light of Dr. Russell's seemingly glib generalization that patients in Clark's reported pain condition would have been *more* diligent in seeking medical intervention, he should have at least accounted for Clark's extensive history of attempts at pain management.

Moreover, Dr. Russell largely ignores Clark's physician's notes in August and September 2011, which noted continued back pain even after a *third* surgery, suggesting that this last surgery -- like the first two -- was not successful.  While Clark may not have been diligent in securing a follow up MRI, Dr. Russell (and defendants) offers no basis why that MRI did not reflect Clark's condition in January 2012.  If anything, it is defendants -- and Dr. Russell on whom they purport to rely -- who wholly failed to provide a reasoned explanation for finding that Clark was *not* disabled as of January 13, 2012, despite strong evidence to the contrary, including multiple failed surgeries, Clark's complaints of back pain in September 2011, Dr. Leonard's assessment of his condition as continuing, and the July 2012 MRI findings.

## C. Creating Moving Target

Finally, Clark argues that after requiring evidence that he was disabled beyond January 2012, defendants then arbitrarily and capriciously discounted the results of his July 2012 MRI because it did not demonstrate Clark's condition as of January 2012. The court has already addressed this argument in the context of discussing defendants' treatment of Dr. Leonard's September 2013 letter.  On remand, defendants should nevertheless consider whether the July 2012 MRI is likely to have reflected Clark's condition as of January 2012 in light of the continuity of evidence in his medical record at those two times.

26

## II.   Appropriate Remedy

Having found a violation of ERISA, this court is directed by the Seventh Circuit to focus on the "claimant's benefit status prior to the denial" to determine the appropriate remedy.  *Holmstrom*, 615 F.3d at 778 (citing *Schneider v. Sentry Group Long Term Disability Plan*, 422 F.3d 621, 629 (7th Cir. 2005)).  The goal is to "restor[e] the *status quo* prior to the defective proceedings."  *Schneider*, 422 F.3d at 629; *see also Hackett*, 315 F.3d at 776.

Here, determining the *status quo* prior to the defective proceedings proves more difficult than in a typical ERISA benefits case.  Clark was originally denied LTDI benefits despite having been awarded short-term disability insurance benefits at the outset.  On the first appeal, defendants granted him benefits for a six-month period of time but denied them past that date.

On the one hand, the decision to end Clark's benefits on January 23, 2012, could be seen as a denial of continued benefits; on the other hand, that decision could be viewed as a termination of benefits.  Given this unique posture, and the Seventh Circuit's position in other cases requiring remand where the Plan Administrator "fails to make adequate findings or fails to provide . . . adequate reasoning . . . unless it is so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground," *Leger*, 557 F.3d at 835, the court will remand this case for further action consistent with this court's opinion.   Among other steps on remand, defendants should:   (1) engage a health care professional who has not been engaged previously in this matter; (2) consider whether to arrange for a physician to conduct a full

physical examination; and (3) weigh the importance, if any, of Clark's recent grant of social security disability insurance benefits.[13]

## ORDER

IT IS ORDERED that:

1) Defendants CUNA Mutual Insurance Society and CUNA Mutual Long Term Disability Plan's motion for summary judgment (dkt. #14) is DENIED

2) Plaintiff Jon Clark's motion for summary judgment (dkt. #17) is GRANTED.

3) This case is remanded to defendants for further administrative proceedings consistent with this opinion.

4) Plaintiff may have until March 29, 2016, to move for an award of fees and costs, along with filing a brief and any supporting materials in support of its request for attorneys' fees, including itemized time records, invoices, and proof of payment of those invoices. Defendants may have until April 5, 2016, to file a response. If defendants challenge the reasonableness of plaintiff's fee request in that opposition, defendants' counsel shall also contemporaneously submit its itemized time records, invoices and proof of payment of such invoices. Plaintiff's reply, if any, is due by April 12, 2016.

Entered this 15th day of March, 2016.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge

---

[13] At the end of each of his briefs, plaintiff requests that the court award attorney's fees and costs. Such an award may be appropriate under 29 U.S.C. § 1132(g)(1), but plaintiff failed to describe the basis for his request. *See Kaiser v. United of Omaha Life Ins. Co.*, No. 14-CV-762-WMC, 2016 WL 379814, at *9-10 (W.D. Wis. Jan. 29, 2016). As such, as detailed in the order, the court will provide plaintiff with an opportunity to file a motion for attorneys' fees and costs.